# Issues Raised by Foreign Relations Authorization Bill

Provision in foreign relations authorization bill conditioning an authorization for appropria-
tions on the requirement that an entity controlled by the legislative branch be included at
Conference on Security and Cooperation in Europe negotiations would unconstitutionally
infringe on the President's exclusive authority to conduct negotiations on behalf of the
United States abroad and unconstitutionally deprive the President of his constitutionally-
mandated control over the disclosure of the content of negotiations.

The unconstitutional condition may be severed from the remainder of the provision authorizing
appropriations and the rest of the bill.

At least in the context of legislation that infringes on the separation of powers, the President has
the constitutional authority to refuse to enforce a statutory provision that he believes is
unconstitutional. Because this unconstitutional requirement is severable, the President may
enforce the remainder of the provision, while refusing to enforce the unconstitutional portion.

February 16, 1990

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

This memorandum is in response to your request for this Office's opinion
on several issues raised by section 102(c) of H.R. 3792*, the foreign rela-
tions authorization bill for fiscal years 1990 and 1991.  Specifically, you
asked whether section 102(c)(2) is unconstitutional; whether it is severable
from the rest of H.R. 3792; and whether the President may decline to en-
force it.  As set forth in greater detail below, we believe that section 102(c)(2)
is plainly unconstitutional.  We further believe that it is severable from sec-
tion 102(c)(1) and the rest of H.R. 3792.  Under the circumstances, we
believe that if the President chooses to sign H.R. 3792, he would be consti-
tutionally authorized to decline to enforce section 102(c)(2).

## Analysis

1. *Section 102(c)(2) Unconstitutionally Infringes on the President's
   Exclusive Authority to Conduct Negotiations on Behalf of the
   United States*

37

Section 102(c) provides:

> (c) INTERNATIONAL CONFERENCES AND CONTIN-
> GENCIES. — (1) There are authorized to be appropriated for
> "International Conferences and Contingencies", $6,340,000 for
> the fiscal year 1990 and $7,300,000 for the fiscal year 1991
> for the Department of State to carry out the authorities, func-
> tions, duties, and responsibilities in the conduct of the foreign
> affairs of the United States with respect to international con-
> ferences and contingencies and for other purposes authorized
> by law.

> (2) None of the funds authorized to be appropriated under
> paragraph (1), may be obligated or expended for any United
> States delegation to any meeting of the Conference on Secu-
> rity and Cooperation in Europe (CSCE) or meetings within
> the framework of the CSCE unless the United States delega-
> tion to any such meeting includes individuals representing the
> Commission on Security and Cooperation in Europe.

The Commission on Security and Cooperation in Europe (the "Commis-
sion") is an entity controlled by the legislative branch. The Commission
consists of twenty-one members, eighteen of whom are drawn from the houses
of Congress, three of whom are appointed by the President. 22 U.S.C. §
3003(a). The Commission is deemed to be a standing committee of Con-
gress for the purpose of receiving disbursements of foreign currencies, *see
id.* § 3007(b), and Commission employees are considered congressional em-
ployees, *id.* § 3008(d).

It is abundantly clear that section 102(c)(2), by purporting to require the
President to include "individuals representing the Commission" as part of a
delegation charged with conducting international negotiations, is unconstitutional.

The President possesses broad authority over the Nation's diplomatic af-
fairs. That authority flows from his position as head of the unitary Executive
and as Commander in Chief. *E.g.*, U.S. Const. art. II, §§ 1, 2 & 3; *Haig v.
Agee*, 453 U.S. 280, 291-92 (1981); *Baker v. Carr*, 369 U.S. 186, 212, 213
(1962); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319-20
(1936). Article II, Section 2 of the Constitution also gives the President the
specific authority to "appoint Ambassadors, other public Ministers and Con-
suls." These constitutional provisions authorize the President to determine
the form and manner in which the United States will maintain relations with
foreign nations, and further to determine the individuals who will conduct
those relations. Section 102(c)(2) of the bill is thus clearly unconstitutional,
on two specific and distinct grounds.

38

First, the courts, the Executive and Congress have all concurred that the President's constitutional authority specifically includes the exclusive authority to represent the United States abroad. As the Supreme Court held in *Curtiss-Wright*, speaking of the "federal power over external affairs":

> In this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation. He makes treaties with the advice and consent of the Senate; but he alone negotiates. Into the field of negotiation the Senate cannot intrude; and Congress itself is powerless to invade it.

299 U.S. at 319 (emphasis omitted). The Court's opinion is directly applicable here: "the President *alone* has the power to speak or listen as a representative of the nation. . . . [H]e *alone* negotiates." *Id.* (emphases added). The Court went on to describe the President's authority in the realm of foreign affairs as

> the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations—a power which does not require as a basis for it's exercise an act of Congress . . . .

*Id.* at 320.

Such authority "in the field of international relations" must self-evidently include the President's power to select his subordinates, who will speak as the President's assistants or agents in the realm of foreign affairs. James Madison observed in the First Congress that: "No person can be forced upon [the President] as an assistant by any other branch of the Government." *The First Congress* 190 (Robert P. Williams ed. 1970).

Justice Nelson relied upon the President's primacy in foreign affairs in dismissing a civil action for damages brought against the commander of an American gun ship that had bombarded a town in Nicaragua where a revolutionary government had engaged in violence against American citizens and their property:

> As the executive head of the nation, the president is made the only legitimate organ of the general government, to open and carry on correspondence or negotiations with foreign nations, in matters concerning the interests of the country or of its citizens.

*Durand v. Hollins*, 8 F. Cas. 111, 112 (C.C.S.D.N.Y. 1860) (No. 4186). In *Goldwater v. Carter*, 617 F.2d 697 (D.C. Cir.), *rev'd on other grounds*, 444 U.S. 996 (1979), the Court of Appeals for the District of Columbia Circuit stated that: "The subtleties involved in maintaining amorphous relationships are often the very stuff of diplomacy -- a field in which the President, not Congress, has responsibility under our Constitution." *Id.* at 708. Section 102(c)(2) plainly conflicts with that fundamental constitutional command.

From the earliest days of the Republic the executive branch has made clear that it controls the representation of the foreign policy of the United States. In 1790, Secretary of State Thomas Jefferson made the point emphatically:

> The transaction of business with foreign nations is Executive altogether. It belongs then to the head of that department, *except* as to such portions of it as are specially submitted to the Senate. *Exceptions* are to be construed strictly.

Opinion on the Powers of the Senate Respecting Diplomatic Appointments, April 24, 1790, *reprinted in* 16 *Papers of Thomas Jefferson* 378, 379 (Julian P. Boyd ed., 1961).

Jefferson made this point with even greater specificity in rebuking Citizen Genet for attempting to present a consul whose commission was addressed to the Congress of the United States. Jefferson emphatically declared that the President is

> the only channel of communication between this country and foreign nations, it is from him alone that foreign nations or their agents are to learn what is or has been the will of the nation, and whatever he communicates as such, they have a right and are bound to consider as the expression of the nation.

Jefferson to Edmond C. Genet, November 22, 1793, *reprinted in* 9 *The Writings of Thomas Jefferson* 256 (Albert E. Bergh ed. 1903).

In modern times Presidents have also asserted their authority to control negotiations. President Bush based his 1989 veto of the FS-X legislation in part upon his constitutional authority to control foreign negotiations:

> In the conduct of negotiations with foreign governments, it is imperative that the United States speak with one voice. The Constitution provides that that one voice is the President's.

II Pub. Papers George Bush 1042, 1043 (July 31, 1989). Other recent Presidents have taken the same view. *E.g.*, President Reagan's Statement on Signing H.R. 1777 into law, II Pub. Papers Ronald Reagan 1541, 1542 (Dec.

22, 1987) (invoking the President's "exclusive authority to determine the time, scope, and objectives" on any international negotiations); President Carter's Statement on Signing H.R. 3363 into law, II Pub. Papers Jimmy Carter 1434 (Aug. 15, 1979) ("decisions associated with the appointment of Ambassadors are acknowledged to be a constitutional prerogative of the President").

Congress has also repeatedly endorsed this understanding of the Constitution. John Marshall, when serving in Congress, described the President's primacy in the conduct of foreign negotiations by referring to the President as "the sole organ of the nation in its external relations, and its sole representative with foreign nations." 10 Annals of Cong. 613 (1800).[1] The Senate Committee on Foreign Relations reported to the Senate in 1816 in similar words:

> The President is the constitutional representative of the United States with regard to foreign nations. He manages our concerns with foreign nations and must necessarily be most competent to determine when, how, and upon what subjects negotiation may be urged with the greatest prospect of success. For his conduct he is responsible to the Constitution. The committee consider[s] this responsibility the surest pledge for the faithful discharge of his duty. They think the interference of the Senate in the direction of foreign negotiations calculated to diminish that responsibility and thereby to impair the best security for the national safety.

Reports of the Senate Committee on Foreign Relations, S. Doc. No. 231, pt. 8, 56th Cong., 2d Sess. 24 (1901).[2]

These examples and authorities by no means exhaust the list of what could be cited in support of our conclusion. Nonetheless, they are clearly sufficient to demonstrate that the President has the constitutional responsibility to represent the United States abroad and thus to choose the individuals through whom the Nation's foreign affairs are conducted. That responsibility cannot be circumscribed by statute.[3] By requiring the President to conduct negotiations by means of certain individuals, section 102(c)(2) would impermissibly interfere with that specific authority over foreign negotiations and diplomatic appointments. Accordingly, the section is unconstitutional.

---

[1] Other congressmen contemporaneously recognized that communications with foreign governments was an exclusive presidential prerogative. For example, Representative James A. Bayard of Delaware noted that "the Constitution has placed the power of negotiation in the hands of the Executive only." 9 Annals of Cong. 2588 (1799); *see also id.* at 2677 (remarks of Rep. Isaac Parker); *id.* at 2494 (remarks of Rep. Roger Griswold).

[2] Both Marshall's and the Committee's statements were cited by the Supreme Court with approval in *Curtiss-Wright*, 299 U.S. at 319.

Second, section 102(c)(2) is also constitutionally offensive on the ground that the individuals illegitimately "appointed" by the section are to "represent" a legislative entity. Section 102(c)(2) thus seeks to inject legislative agents directly into the Executive's foreign relations negotiations, giving Congress regular and unsupervised access to privileged information. The role section 102(c)(2) thus envisions for the legislative branch—which would be "represented" on a negotiating delegation and presumably would receive reports on the conduct of negotiations from their "representative"— would deprive the President of his constitutionally-mandated control over the disclosure of the content of negotiations.[4] That control—a necessary and recognized element of executive authority—would be impaired by section 102(c)(2).

That the Constitution mandates Presidential control over the disclosure of negotiations was an essential element of the Founders' vision. As John Jay wrote in *The Federalist*:

> It seldom happens in the negotiation of treaties, of whatever nature, but that perfect *secrecy* and immediate *dispatch* are sometimes requisite. There are cases where the most useful intelligence may be obtained, if the persons possessing it can be relieved from apprehensions of discovery. Those apprehensions will operate on those persons whether they are actuated by mercenary or friendly motives; and there doubtless are many of both descriptions who would rely on the secrecy of the President, but who would not confide in that of the Senate, and still less in that of a large popular assembly. The convention [has] done well, therefore, in so disposing of the power of making treaties that although the President must, in forming them, act by the advice and consent of the Senate, yet he will be able to manage the business of intelligence in such manner as prudence may suggest. . . . So often and so essentially have we heretofore suffered from the want of secrecy and dispatch

---

[3] Nor can section 102(c)(2) be viewed as a legitimate exercise of congressional power over the appropriation of public funds. Congress may not use that power

> to attach conditions to executive branch appropriations requiring the President to relinquish his constitutional discretion in foreign affairs. . . . [T]he President cannot be compelled to give up the authority of his Office as a condition of receiving the funds necessary to carrying out the duties of his Office.

*Constitutionality of Proposed Statutory Provision Requiring Prior Congressional Notification for Certain CIA Covert Actions,* 13 Op. O.L.C. 258, 261-62 (1989) (footnote omitted).

[4] That participatory role in ongoing negotiations is also completely divorced from the Framers' intentions with respect to the activities and authority of the legislative branch. As Alexander Hamilton explained:

> The essence of the legislative authority is to enact laws, or, in other words, to prescribe rules for the regulation of the society; while the execution of the laws and the employment of the common strength, either for this purpose or for the common defense, seem to comprise all the functions of the executive magistrate.

*The Federalist* No. 75, at 450 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

42

that the Constitution would have been inexcusably defective if no attention had been paid to those objects.

*The Federalist* No. 64, at 392-93 (John Jay) (Clinton Rossiter ed., 1961). Similarly, James Madison, while serving in Congress, observed that "the Executive had a right, under a due responsibility, also, to withhold information, when of a nature that did not permit a disclosure of it at the time." 5 Annals of Cong. 773 (1796).

Moreover, the executive branch has repeatedly objected to requirements for mandatory disclosure of information to Congress about international negotiations. At the same time, where possible, all Presidents have provided broad information to Congress about international negotiations.[5] The conduct of international negotiations is a function committed to the President by the Constitution, see *supra*, and he must have the authority to determine what information about such international negotiations may, in the public interest, be made available to Congress and when such disclosure should occur. As the Supreme Court observed in *Curtiss-Wright*:

> [C]ongressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved. Moreover, he, not Congress, has the better opportunity of knowing the conditions which prevail in foreign countries . . . . He has his confidential sources of information. He has his agents in the form of diplomatic, consular and other officials. Secrecy in

---

[5] This balanced view of the President's responsibilities with respect to the disclosure of negotiations has been the consistent position of the executive branch since 1792, when President Washington received a request from the Congress for all "persons, papers, and records" relating to the failure of Major General St. Clair's military expedition against the Indians. 2 Annals of Cong 493 (1792). Secretary of State Jefferson's notes reflect that President Washington thereafter convened the Cabinet to determine the proper response. 1 *The Writings of Thomas Jefferson* 303 (Andrew A. Lipscomb ed., 1903). The President and the Cabinet concluded that "the Executive ought to communicate such papers as the public good would permit, and ought to refuse those, the disclosure of which would injure the public." *Id.* at 304. The President ultimately decided to produce the requested documents. He directed Secretary Jefferson to negotiate an agreement with Congress that acknowledged the President's right to protect state secrets, the public disclosure of which he determined could adversely affect national security. Jefferson's efforts were successful, and on April 4, 1792, the House resolved

> [t]hat the President of the United States be requested to cause the proper officers to lay before this House *such papers of a public nature*, in the Executive Department, as may be necessary to the investigation of the causes of the failure of the late expedition under Major General St. Clair.

3 Annals of Cong. 536 (1792) (emphasis added).

   Similarly, in 1794, the Senate requested correspondence between the U. S. Minister to France and the Republic of France, and between the Minister and the State Department. Senate Journal, 3d Cong., 1st Sess. 42 (1794). President Washington submitted certain of the correspondence requested, but withheld "those particulars which, in my judgment, for public considerations, ought not to be communicated." 1 James D. Richardson, *Messages and Papers of the Presidents* 152 (1896).

43

respect of information gathered by them may be highly necessary, and the premature disclosure of it productive of harmful results. Indeed, so clearly is this true that the first President refused to accede to a request to lay before the House of Representatives the instructions, correspondence and documents relating to the negotiation of the Jay Treaty — a refusal the wisdom of which was recognized by the House itself and has never since been doubted.

299 U.S. at 320.[6] *Curtiss-Wright* thus clearly establishes that the President has the authority to determine what information about international negotiations may, in the public interest, be made available to Congress and when, if at all, such disclosure should occur. Section 102(c)(2), however, would subvert the President's control over the disclosure of negotiations by inserting a "representative" of the legislative branch into diplomatic negotiations.[7]

Again, the examples and authorities offered do not exhaust those that could be invoked in support of our conclusion. Nonetheless, we believe that the historical record is clear that the President has the constitutional authority to control disclosure of the content of negotiations to Congress. It follows, equally clearly, that a provision that purports to place a "representative" of a legislative entity upon an executive negotiating team is inconsistent with that authority, and is unconstitutional.

## 2. Section 102(c)(2) is Severable

The unconstitutional requirement that representatives of the Commission be included at the CSCE negotiations may be severed from the authorization for appropriations. Because the condition is severable, the President may enforce the remainder of the provision, disregarding the condition contained in section 102(c)(2).

A presumption in favor of the severability of unconstitutional provisions exists so long as what remains of the statute is capable of functioning independently. *See, e.g., Regan v. Time, Inc.*, 468 U.S. 641, 653 (1984) (plurality opinion); *Alaska Airlines, Inc. v. Donovan*, 766 F.2d 1550, 1560 (D.C. Cir. 1985), *aff'd sub nom. Alaska Airlines, Inc. v. Brock*, 480 U.S. 678 (1987). As the Supreme Court has explained on many occasions, "[u]nless it is evident that the Legislature would not have enacted those provisions which

---

[6] The Court in *Curtiss-Wright* specifically endorsed President Washington's refusal to provide the House with information it requested about treaty negotiations, even after the negotiations had been concluded. 299 U.S. at 320-21. A fortiori, the President has constitutional authority to withhold such information during the negotiations.

[7] The effect of this provision would also be to vitiate the President's authority to determine not to disclose particular information because such disclosure would jeopardize national security. *See United States v. Nixon*, 418 U.S. 683, 710-11 (1974); *Assertion of State Secrets Privilege in Civil Litigation*, 3 Op. O.L.C. 91 (1979).

44

are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Champlin Ref. Co. v. Corporation Comm'n*, 286 U.S. 210, 234 (1932), *quoted in Alaska Airlines*, 480 U.S. at 684. This presumption may be overcome by evidence that, absent the unconstitutional provision, the statute will not function "in a *manner* consistent with the intent of Congress." *Alaska Airlines, Inc. v. Brock*, 480 U.S. at 685.

The authorization contained in section 102(c)(1) functions independently of the provision in section 102(c)(2). Accordingly, the unconstitutional condition in section 102(c)(2) may be severed from the remainder of the provision unless there is evidence that Congress would not have enacted the authorization absent the condition.[8]

There is no such evidence. Nothing in the debates concerning the condition suggests that Congress would not have enacted the authorization if the requirement of Commission representation was invalidated. The condition was added in the House as an amendment to the existing authorization provision. *See* 135 Cong. Rec. 6265 (1989). Its purpose was to enable members of the Commission to continue their previous participation in the CSCE negotiations. *See* 135 Cong. Rec. 14,787 (1989) (statement of Sen. Fowler); *id.* (statement of Sen. D'Amato); *id.* (statement of Sen. DeConcini). No one, however, indicated that they would disapprove funding for the negotiations if the Commission access requirement were deleted. The chairman of the House subcommittee said only that "[i]t is an okay amendment." 135 Cong. Rec. 6265 (1989) (statement of Rep. Dymally).

That Congress early desired to impose the condition on the authorization does not mean that Congress would not have authorized the funds without the condition. The Supreme Court declined to make this assumption in *FCC v. League of Women Voters*, 468 U.S. 364 (1984), where the court held that an appropriations law's prohibition on editorializing by public broadcasting stations violated the First Amendment, but did not even consider whether the invalidity of the condition should result in the invalidity of the entire

---

[8] We reject any argument that the conditional clause "unless the United States delegation to any such meeting includes individuals representing the Commission on Security and Cooperation in Europe" is the relevant language to be severed from the provision. It is merely an accident of grammar that this clause can be deleted without making nonsense of section 102(c)(2) as a whole  Moreover, with this clause deleted section 102(c)(2) would deny the President funding for a particular type of negotiations. For the reasons discussed above, this would in itself raise serious constitutional questions as an interference with the President's authority to conduct diplomacy as he sees fit. There is obviously no reason to prefer a severability analysis that presents the same constitutional questions that gave rise to the analysis in the first place. *Cf. Edward J. DeBartolo Corp v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (statutes should be construed to avoid constitutional questions). Section 102(c)(2) in its entirety is naturally understood as the condition regarding the CSCE negotiations, and the proper question is whether that whole section is severable.

appropriation.[9]  Indeed, we are aware of no instance in which the Supreme Court has ever invalidated an appropriation because a condition on the use of the appropriation was held unconstitutional.

We are also reluctant to attribute to Congress an intent to preclude the United States from engaging in the CSCE negotiations.  Congress was keenly aware of the significance of the negotiations concerning conventional military forces in Europe.  The care with which Congress considered the negotiations illustrates their importance to Congress.  We cannot believe that Congress would have preferred no participation by the United States in the CSCE negotiations to participation by a delegation that does not include representatives of the Commission.

### 3.  The President May Refuse to Enforce Section 102(c)(2)

The final issue we address is whether the President may refuse to enforce an unconstitutional provision such as section 102(c)(2).[10]  The Department of Justice has consistently advised that the Constitution provides the President with such authority.  Both the President's obligation to "take Care that the Laws be faithfully executed" and the President's oath to "preserve, protect and defend the Constitution of the United States" vest that conflict with the highest law, the Constitution.  We emphasize, however, that there is little judicial authority concerning this question, and the position remains controversial.

The President's authority to refuse to enforce a law that he believes is unconstitutional derives from his duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3 and the obligation to "preserve, protect and defend the Constitution of the United States" contained in the President's oath of office.  U.S. Const. art. II, § 1.  The Constitution is the supreme law that the President has a duty to take care to faithfully execute.[11]  Where a statute enacted by Congress conflicts with the Constitution, the President is placed in the position of having the duty to execute two conflicting "laws":  a constitutional provision and a contrary statutory

---

[9] Justice Stevens, dissenting alone, said that there was a "serious question . . . whether the entire public funding scheme is severable from the prohibition on editorializing and political endorsements." *FCC v. League of Women Voters*, 468 U.S. at 411 n.3 (Stevens, J., dissenting).

[10] The analysis of this question does not depend on whether the President signed the bill or not.  As the Supreme Court has observed, "it is not uncommon for Presidents to approve legislation containing parts which are objectionable on constitutional grounds." *INS v. Chadha*, 462 U.S. 919, 942 n.13 (1983) That the President has signed the bill in no way estops his ability to assert the bill's unconstitutionality, in court or otherwise. *See id.*

[11] It is generally agreed that the Constitution is a law within the meaning of the Take Care Clause. *See, e.g.*, *Constitutionality of GAO's Bid Protest Function:  Hearings Before the Subcomm. of the House Comm. on Government Operations*, 99th Cong., 1st Sess. 23 (1985) *("Bid Protest Hearings")* (statement of Professor Mark Tushnet) ("the President is required faithfully to execute the laws of the United States, which surely include the Constitution as supreme law"); *Letter for Secretary of Education Shirley M. Hufstedler from Attorney General Benjamin R. Civiletti* at 12 (June 5, 1980) ("the Executive's duty faithfully to execute the law embraces a duty to enforce the fundamental law set forth in the Constitution as well as a duty to enforce the law founded in the Acts of Congress, and cases arise in which the duty to the one precludes the duty to the other").

46

requirement. The resolution of this conflict is clear: the President must heed the Constitution—the supreme law of our Nation.

Moreover, the Take Care Clause does not compel the President to execute unconstitutional statutes. An unconstitutional statute is not a law. Alexander Hamilton explained:

> There is no position which depends on clearer principles than that every act of a delegated authority, contrary to the tenor of the commission under which it is exercised, is void. No legislative act, therefore, contrary to the Constitution, can be valid. To deny this would be to affirm that the deputy is greater than his principal; that the servant is above his master; that the representatives of the people are superior to the people themselves; that men acting by virtue of powers may do not only what their powers do not authorize, but what they forbid.

*The Federalist* No. 78, at 467 (Alexander Hamilton) (Clinton Rossiter ed., 1961). John Marshall stated the same position in *Marbury v. Madison*:

> Certainly all those who have framed written constitutions contemplate them as forming the fundamental and paramount law of the nation, and consequently the theory of every such government must be, that *an act of the legislature, repugnant to the constitution, is void.*

5 U.S. (1 Cranch) 137, 177 (1803) (emphasis added).[12]

The President's oath of office is the other constitutional provision authorizing the President to refuse to enforce a law. The Constitution requires the President to take an oath in which he promises to "preserve, protect and defend the Constitution of the United States." U.S. Const. art II, § 1. As Chief Justice Chase asked, "How can the President fulfill his oath to preserve, protect, and defend the Constitution, if he has no *right* to *defend* it against an act of Congress sincerely believed by him to have been passed in violation of it?" Letter from Chief Justice Chase to Gerrit Smith, Apr. 19, 1868, *quoted in* J. W. Schuckers, *The Life and Public Services of Salmon*

---

[12] Even though the Constitution provides that a measure enacted pursuant to the procedure described in U.S. Const. art. I, § 7 "shall become a Law," the fact that a law was adopted consistently with the constitutional process will not save it. Only laws "made in Pursuance" of the Constitution "shall be the supreme Law of the Land." U.S. Const. art. VI; *see also Marbury v. Madison*, 5 U.S. (1 Cranch) at 180. A law that is not in pursuance of the Constitution is not the supreme law of the land — indeed, it is not law. And if an unconstitutional law is void, then the President has no obligation to enforce it. *See, e.g.,* Letter from Chief Justice Chase to Gerrit Smith, Apr 19, 1868, *quoted in* J. W. Schuckers, *The Life and Public Services of Salmon Portland Chase* 577 (1874) ("Nothing is clearer to my mind than that acts of Congress not warranted by the Constitution are not laws "); 11 Op. Att'y Gen. 209, 214 (1865) ("If any law be repugnant to the Constitution, it is void; in other words, it is no law.").

*Portland Chase* 578 (1874) ("Letter from Chief Justice Chase"). Chief Justice Chase concluded that the President's obligation to defend the Constitution of the United States authorizes him to decline to enforce statutes which he believes are unconstitutional.[13] The President's obligation to defend the Constitution permits him to decline to enforce a statute which is unconstitutional. Just as the Take Care Clause requires the President to faithfully execute the laws, including the Constitution as the supreme law, the oath to defend the Constitution allows the President to refuse to execute a law he believes is contrary to the supreme law, the Constitution.

Indeed, the Framers of the Constitution anticipated the question of the President's authority to refuse to enforce unconstitutional laws and indicated that the Constitution affords the President the authority to refuse to enforce unconstitutional legislation. James Wilson, one of the key drafters and advocates of the Constitution, addressed this question before the Pennsylvania convention that was debating whether to ratify the proposed Constitution. He stated:

> [I]t is . . . proper to have efficient restraints upon the legislative body. These restraints arise from different sources. I will mention some of them. . . . I had occasion, on a former day . . . to state that the power of the Constitution was paramount to the power of the legislature, acting under that Constitution. For it is possible that the legislature, when acting in that capacity, may transgress the bounds assigned to it, and an act may pass, in the usual *mode*, notwithstanding that transgression; but when it comes to be discussed before the judges -- when they consider its principles and find it to be incompatible with the superior power of the Constitution, it is their duty to pronounce it void. . . . *In the same manner, the President of the United States could shield himself and refuse to carry into effect an act that violates the Constitution.*

2 *The Documentary History of the Ratification of the Constitution* 450 (Merrill Jensen ed. 1976) (statement of James Wilson on Dec. 1, 1787) (second emphasis added).

---

[13] Chief Justice Chase answered his question by endorsing President Johnson's decision to refuse to enforce the law:

> To me, therefore, it seems perfectly clear that the President had a perfect right, and indeed was under the highest obligation, to remove Mr. Stanton, if he made the removal not in wanton disregard of a constitutional law, but with a sincere belief that the Tenure-of-Office Act was unconstitutional and for the purpose of bringing the question before the Supreme Court. Plainly it was a proper and peaceful, if not the only proper and peaceful mode of protecting and defending the Constitution.

Letter from Chief Justice Chase at 578. Similarly, this Office has opined that "the President's duty to uphold the Constitution carries with it a prerogative to disregard unconstitutional statutes." Memorandum for Robert J. Lipshutz, Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel at 16 (Sept. 17, 1977) ("Harmon Memorandum").

This understanding comports with the Framers' profound structural concern about the threat of legislative encroachments on the Executive and the judiciary. As Madison observed, "The legislative department is everywhere extending the sphere of its activity and drawing all power into its impetuous vortex." *The Federalist* No. 48, at 309 (James Madison) (Clinton Rossiter ed., 1961). As Chief Justice Burger more recently admonished, "[t]he hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted." *INS v. Chadha*, 462 U.S. at 951. In particular, presidential decisions not to enforce a statute which violates the separation of powers have been justified by the need to resist legislative encroachment. For example, in 1860 Attorney General Black advised President Buchanan that the President could refuse to enforce an unconstitutional condition in a law:

> Congress is vested with legislative power; the authority of the President is executive. Neither has a right to interfere with the functions of the other. Every law is to be carried out so far forth as is consistent with the Constitution. . . . You are therefore entirely justified in treating this condition (if it be a condition) as if the paper on which it is written were blank.

9 Op. Att'y Gen. 462, 469-70 (1860).[14]

For the reasons discussed above, the Department of Justice in modern times has also consistently advised that the Constitution authorizes the President to refuse to enforce a law that he believes is unconstitutional. *See, e.g.*, Letter for Congressman Peter W. Rodino, Jr., from Attorney General William French Smith at 3 (Feb. 22, 1985) ("Attorney General Smith Letter") (the decision not to enforce the Competition in Contracting Act was based upon "the duty of the President to uphold the Constitution in the context of the enforcement of Acts of Congress" and the President's "oath to 'preserve, protect and defend' the Constitution"); Letter for Congressman Thomas P. O'Neill, Jr., from Attorney General Benjamin R. Civiletti (Jan. 13, 1981); Harmon Memorandum at 16 ("the President's duty to uphold the Constitution carries with it a prerogative to disregard unconstitutional statutes"). The Department has given the same advice whether or not the President signed the law which he intends not to enforce. *See,. e.g.*, Attorney General Smith Letter; Harmon Memorandum.

---

[14] *See also* Raoul Berger, *Executive Privilege: A Constitutional Myth* 309 (1974) ("Agreed that a veto exhausts presidential power when the issue is the *wisdom* of the legislation. But the object of the Framers was to prevent '*encroachment*'; and they were too practical to limit the President's power to 'defend' the Constitution against a breach of its very essence: the separation of powers. . . . I would therefore hold that the presidential oath to 'protect and defend the Constitution' posits both a right and a duty to protect his own constitutional functions from congressional impairment.").

We, too, conclude that at least in the context of legislation that infringes the separation of powers, the President has the constitutional authority to refuse to enforce unconstitutional laws. The opinions of the Department of Justice have long recognized the President's authority to refuse to enforce a statutory provision that interferes with the President's exercise of his constitutional powers. *See, e.g.*, Attorney General Smith Letter at 3 (the decision not to enforce the Competition in Contracting Act was justified by the President's "constitutional duty to protect the Presidency from encroachment by the other branches"); *Recommendation that the Department of Justice not Defend the Constitutionality of Certain Provisions of the Bankruptcy Amendments and Federal Judgeship Act of 1984*, 8 Op. O.L.C. 183, 195 (1984) (describing the historical practice of the President "under which the President need not blindly execute or defend laws enacted by Congress if such laws trench on his constitutional power and responsibility"). James Wilson's statement, quoted above, provides further evidence of the constitutional authority of the President to shield himself from unconstitutional legislation by refusing to enforce such laws. We therefore advise that the President has the constitutional power to refuse to enforce laws that violate the separation of powers.

We recognize that opponents of presidential authority to refuse to enforce an unconstitutional statute attempt to draw support for their views in the same constitutional texts cited by proponents of such authority. The Take Care Clause is often quoted as providing self-evident proof that the President may not refuse to enforce a law which he believes is unconstitutional.[15] This reading of the provision denies the President any discretion to refuse to enforce a law that is unconstitutional. *See, e.g., Bid Protest Hearings* at 88 (Letter from Professor Eugene Gressman).

We reject this reading of the Take Care Clause because it rests on two faulty premises concerning the nature of the "laws" which the President must enforce: first, that the President will never be faced with a conflict between a statute and the Constitution, and second, that an unconstitutional law is truly "law" for the purposes of the Take Care Clause. As explained above, both of these premises are invalid. Statutes do conflict with the Constitution, and unconstitutional statutes are not laws the President must faithfully execute.

We are also aware that others have argued that the President may not refuse to enforce a law because the executive branch is not the institution within the federal government that is authorized to determine whether a law is unconstitutional. We have ourselves testified that "until a law is adjudi-

---

[15] *See, e.g., Lear Siegler, Inc., Energy Prods. Div. v. Lehman*, 842 F.2d 1102, 1124 (9th Cir. 1988) ("To construe this duty to faithfully execute the laws as implying the power to forbid their execution perverts the clear language of the 'take care' clause . . . ."), *withdrawn in relevant part*, 893 F.2d 205 (9th Cir. 1989); Arthur S. Miller, *The President and Faithful Execution of the Laws*, 40 Vand. L. Rev. 389, 396 (1987) ("To say that the President's duty to faithfully execute the laws implies a power to forbid their execution is to flout the plain language of the Constitution.").

cated to be unconstitutional, the issue of enforcing a statute of questionable constitutionality raises sensitive problems under the separation of powers." *Bid Protest Hearings* at 318-19 (statement of Acting Deputy Attorney General D. Lowell Jensen). We reject, however, the argument that the President may not treat a law as invalid prior to a judicial determination but rather must presume it to be constitutional. It affects a subtle, but fundamental transformation from the position, established in *Marbury*, that in deciding a case or controversy the judiciary ultimately decides whether a statute is constitutional to the position that a law is unconstitutional *only* when the courts say it conflicts with the Constitution. Professor Levinson has explained why this cannot be so:

> If one believes that the judiciary "finds" the [law] instead of "creating" it, then the law is indeed "unconstitutional from the start." Indeed, the judicial authority under this view is derived from its ability to recognize the constitutionality or unconstitutionality of laws, but, at least theoretically, the constitutional status is independent of judicial recognition. To argue otherwise is ultimately to adopt a theory that says that the basis of law — including a declaration of unconstitutionality — is the court's decision itself. Among other problems with this theory is the incoherence it leads to in trying to determine what it can mean for judges to be faithful to their constitutional oaths.

*Bid Protest Hearings* at 67.

Still others have argued that the veto power is the only tool available to the President to oppose an unconstitutional law. We agree that the veto power is the primary tool available to the President. We disagree, however, with the contention that the Framers intended it to be the only tool at the President's disposal. James Wilson's statement, quoted above, demonstrates that the idea that the President has the authority to refuse to enforce a law which he believes is unconstitutional was familiar to the Framers. The Constitution qualifies the President's veto power in the legislative process, but it does not impose a similar qualification on his authority to take care that the laws are faithfully executed.

Finally, we emphasize that this conclusion does not permit the President to determine as a matter of policy discretion which statutes to enforce. The only conclusion here is that he may refuse to enforce a law which he believes is *unconstitutional*. Obviously, the argument that the President's obligation to defend the Constitution authorizes him to refuse to enforce an unconstitutional statute does not authorize the President to refuse to enforce a statute he opposes for policy reasons. Thus, instances in which courts

51

have rejected the claims of general presidential discretion to refuse to enforce a statutory command are irrelevant to the question of whether the President may refuse to enforce a law because he considers it unconstitutional.[16]

## Conclusion

For the reasons given above, we conclude that section 102(c)(2) is unconstitutional. We also conclude that it is severable, and that the President may constitutionally decline to enforce it.

WILLIAM P. BARR
*Assistant Attorney General*
*Office of Legal Counsel*

---

[16] In *Kendall v. United States,* 37 U.S. (12 Pet.) 524 (1838), the Postmaster General refused to comply with a statute that ordered him to pay two contractors for mail carrying services. The Court, although denying that the President was making such an argument, said, "To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible." *Id.* at 613. *Kendall,* however, did not involve a claim by the President that he was being ordered to enforce an unconstitutional law, and thus the Court had no occasion to examine the unique considerations presented by such a claim.

President Nixon's decision to impound funds appropriated by Congress is another example of an executive refusal to enforce a federal law, but there, too, President Nixon did not contend that the law was unconstitutional. Assistant Attorney General Rehnquist acknowledged that "it seems an anomalous proposition that because the Executive branch is bound to execute the laws, it is free to decline to execute them." He added, however, that "[o]f course, if a Congressional directive to spend were to interfere with the President's authority in an area confided by the Constitution to his substantive direction and control, such as his authority as Commander-in-Chief of the Armed Forces and his authority over foreign affairs, a situation would be presented very different from the one before us." Memorandum *Re: Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools* at 11 (Dec. 1, 1969) (citation omitted).